**EXECUTION COPY**

**ASSET PURCHASE AGREEMENT**

**Dated as of July 24, 2019**

**Between**

**MIRIAM R. STEIN, NOT INDIVIDUALLY, BUT SOLELY IN HER CAPACITY AS CHAPTER 7 TRUSTEE OF THE BANKRUPTCY ESTATE OF JOHNSON PUBLISHING COMPANY, LLC,**

**As Seller**

**and**

**THE J. PAUL GETTY TRUST,** as the representative of and on behalf of The J. Paul Getty Trust, The Ford Foundation, John D. and Catherine T. MacArthur Foundation and The Andrew W. Mellon Foundation

**As Purchaser**

# TABLE OF CONTENTS

**Page**

SECTION 1 DEFINITIONS ................................................................................................... 2

    1.1    Definitions .......................................................................................... 2

    1.2    Other Definitional and Interpretive Matters. ..................................... 10

SECTION 2 PURCHASE AND SALE ................................................................................. 11

    2.1    Purchased Assets. ............................................................................... 11

    2.2    Excluded Assets. ................................................................................ 12

    2.3    Assumed Liabilities. .......................................................................... 14

    2.4    Excluded Liabilities. .......................................................................... 14

    2.5    Assignments. ...................................................................................... 16

    2.6    Further Assurances ............................................................................. 17

    2.7    "As Is, Where Is", "Quitclaim" Transaction. ................................... 17

SECTION 3 PURCHASE PRICE ........................................................................................ 18

    3.1    Purchase Price. ................................................................................... 18

    3.2    Closing Date Payment. ....................................................................... 18

SECTION 4 THE CLOSING ............................................................................................... 18

    4.1    Closing Date. ...................................................................................... 18

    4.2    Purchaser's Deliveries. ...................................................................... 19

    4.3    Seller's Deliveries. ............................................................................. 19

SECTION 5 REPRESENTATIONS AND WARRANTIES OF SELLER ............................... 20

    5.1    Organization of Debtor. ..................................................................... 20

    5.2    Subsidiaries and Investments. ........................................................... 20

    5.3    Authority of Seller. ............................................................................ 21

    5.4    Consents and Approvals. .................................................................... 21

    5.5    Title to Purchased Assets. .................................................................. 21

    5.6    Schedule of Archive Intellectual Property. ........................................ 21

    5.7    No Government Violations. ................................................................. 21

    5.8    No Pending or Threatened Suits. ........................................................ 21

    5.9    Condition of the Assets. ..................................................................... 21

    5.10   No Finder. .......................................................................................... 22

SECTION 6 REPRESENTATIONS AND WARRANTIES OF PURCHASER ....................... 22

    6.1    Organization and Authority of Purchaser. ......................................... 22

# TABLE OF CONTENTS

(continued)

**Page**

6.2     Payment of Purchase Price; Bidding Procedures. ................................................. 23

6.3     Investigation by Purchaser. ................................................................................. 23

6.4     Ownership of Debtor; Good Faith. ...................................................................... 23

SECTION 7 COVENANTS OF THE PARTIES ........................................................... 23

7.1     Maintenance of Purchased Assets Prior to the Closing Date. ............................. 24

7.2     Access to the Business by Purchaser. ................................................................. 24

7.3     Expenses. ........................................................................................................... 24

7.4     Governmental Approvals. ................................................................................... 24

7.5     Tax Matters. ........................................................................................................ 26

7.6     Bankruptcy Matters. ........................................................................................... 26

7.7     Adequate Assurances Regarding Assumed Contracts and Assumed Leases. ....... 28

7.8     Intentionally Omitted. ......................................................................................... 28

7.9     Reasonable Access to Records and Certain Personnel. ....................................... 28

7.10    Collection of Receivables. ................................................................................... 28

7.11    Obligations of Seller. .......................................................................................... 28

7.12    Notification of Breach; Disclosure. ..................................................................... 29

SECTION 8 CONDITIONS TO CLOSING ................................................................. 29

8.1     Conditions to Obligations of Each Party. ............................................................ 29

8.2     Conditions to Obligations of Purchaser. ............................................................. 29

8.3     Conditions to Obligations of Seller. .................................................................... 30

SECTION 9 TERMINATION ...................................................................................... 31

9.1     Termination. ........................................................................................................ 31

9.2     Effect of Termination. ......................................................................................... 32

SECTION 10 MISCELLANEOUS PROVISIONS ....................................................... 32

10.1    Amendment and Modification. ............................................................................ 32

10.2    Survival. .............................................................................................................. 32

10.3    Notices. ............................................................................................................... 33

10.4    Successors and Assigns. ...................................................................................... 34

10.5    Severability. ........................................................................................................ 34

10.6    Governing Law. ................................................................................................... 34

10.7    Waivers. .............................................................................................................. 35

# TABLE OF CONTENTS
(continued)

**Page**

10.8    Execution in Counterparts.................................................................................... 35

10.9    Incorporation of Schedules and Exhibits. ........................................................... 35

10.10   Entire Agreement. ............................................................................................... 35

10.11   Remedies.............................................................................................................. 36

10.12   Mutual Drafting: Headings. ................................................................................ 36

10.13   No Third Party Beneficiaries. ............................................................................. 36

10.14   Bulk Sales Law. .................................................................................................. 36

## TABLE OF CONTENTS
(continued)

## SCHEDULES

| Section | Schedule |
|---------|----------|
| 2.1(j) | Assumed Contracts |
| 2.1(k) | Assumed Leases |
| 5.2 | Subsidiaries and Investments |
| 5.4 | Consents and Approvals |
| 5.5 | Alleged Competing Ownership Claims to Certain Purchased Assets |
| 5.6 | Intellectual Property |
| 5.7 | Government Violations |
| 5.8 | Pending or Threatened Suits |
| 5.9 | Insurance Policies |

## EXHIBIT LIST

EXHIBIT A - FORM OF SALE ORDER
EXHIBIT B - FORM OF ASSUMPTION AND ASSIGNMENT AGREEMENT
EXHIBIT C - FORM OF BILL OF SALE
EXHIBIT D - JOHNSON PUBLISHING COMPANY, LLC ARCHIVE
EXHIBIT D-1 - SNAPSHOTS
EXHIBIT E - JOHNSON PUBLISHING COMPANY, LLC ARTWORK
EXHIBIT F - COUNTERPARTIES TO PURCHASER AFTER CLOSING
EXHIBIT F-1 -  DEBTOR'S CERTIFICATE
EXHIBIT G - LIST OF MAGAZINES
EXHIBIT H - FORM OF ASSIGNMENT OF TRADEMARKS, FORM OF ASSIGNMENT OF
COPYRIGHTS

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "<u>Agreement</u>") is made as of July  24, 2019, by and between Miriam R. Stein, not individually, but solely in her capacity as Chapter 7 Trustee (the "<u>Trustee</u>" or "<u>Seller</u>") of the bankruptcy estate of Johnson Publishing Company, LLC, a Delaware limited liability company (the "<u>Debtor</u>" and such bankruptcy estate of the Debtor the "<u>Estate</u>" ), and THE J. PAUL GETTY TRUST, a California charitable trust, as the representative of and on behalf of The J. Paul Getty Trust, The Ford Foundation, John D. and Catherine T. MacArthur Foundation and The Andrew W. Mellon Foundation or any of their designees (the "<u>Purchaser</u>"). Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in <u>Section 1.1</u>.

**WHEREAS**, Debtor owns, among other assets, the Archive and certain of the Archive Intellectual Property;

**WHEREAS**, on April 9, 2019, the Debtor filed a petition under Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Illinois at case number 19-10236-JBS;

**WHEREAS**, on April 9, 2019, the Trustee was appointed as the Chapter 7 Trustee for the case and continues to serve in that capacity;

**WHEREAS**, the Bidding Procedures Order has been entered by the Bankruptcy Court, providing the framework and rules for an auction sale of the Archive to the highest bidder;

**WHEREAS**, Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, the Purchased Assets comprised of the Archive, the Archive Intellectual Property and the Name Rights and assume the Assumed Liabilities, upon the terms and conditions hereinafter set forth;

**WHEREAS**, the Parties intend to effectuate the transactions contemplated by this Agreement pursuant to section 363 of the Bankruptcy Code; and

**WHEREAS**, the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject, among other things, to the entry of the Sale Order by the Bankruptcy Court.

**NOW**, **THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties agree as follows:

# SECTION 1
# DEFINITIONS

**1.1**     **Definitions.**

In this Agreement, the following terms have the meanings specified or referred to in this Section 1.1 and shall be equally applicable to both the singular and plural forms.

(a)     "Accounts Receivable" means, with respect to the Debtor, all accounts receivable and other rights to payment of Debtor related exclusively to the Archive and the Archive Intellectual Property and the full benefit of all security for such accounts receivable or rights to payment, any other miscellaneous accounts receivable of Debtor, and any claim, remedy or other right of Debtor related exclusively to any of the foregoing.

(b)     "Action" means any legal action, suit or arbitration, or any inquiry, proceeding or investigation, by or before any Governmental Authority.

(c)     "Affiliate" means, as to any Person, any other Person which directly or indirectly controls, or is under common control with, or is controlled by, such Person. As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") means possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise) of such Person.

(d)     "Agreement" has the meaning specified in the preamble.

(e)     "Alternative Transaction" means a sale, lease or other disposition, directly or indirectly, by merger, consolidation, tender offer, share exchange or otherwise, of all or a material portion of the Purchased Assets, excluding the Excluded Assets and Excluded Liabilities, with or by any Person or group of Persons (other than Purchaser).

(f)     "Ancillary Documents" means the Bill of Sale, Assumption and Assignment Agreement, Assignment of Trademarks, Assignment of Copyrights, Assumption and Assignment of Leases, and each other agreement, document or instrument (other than this Agreement) executed and delivered by the Parties in connection with the consummation of the transactions contemplated by this Agreement.

(g)     "Archive" means the Debtor's archive, which is comprised of approximately four (4) million individual tangible items, including photographic prints (silver gelatin prints, color prints, digital prints and snapshots), negatives, contact sheets, color transparencies, films and videos (cassettes, open reels and compact discs), magazine covers, and other images and any digital copies of any of the foregoing and any and all data related thereto. The contents of the Archive include, but are not limited to, the items listed on Exhibit D and Exhibit D-1.

(h)     "Archive Equipment" means any and all equipment relating to the Archive, including without limitation any equipment used to access, view, project and/or display the images in the Archive, such as video players (including players that are compatible with VHS

-2-

and/or Beta tapes), lightboxes, transparency viewers and/or projectors, and including all filing cabinets, archival boxes, folders, plastic sleeves, and any other containers and storage boxes in which the archives are stored.

(i)      "Archive Intellectual Property" means all Intellectual Property rights related exclusively to the Archive.

(j)      "Artwork" means all works of art owned by the Debtor, including without limitation, paintings, drawings, prints and sculptural works located in Debtor's office at 200 South Michigan Avenue, 9th Floor, Chicago, Illinois, in storage in Illinois, New York and any other location, as well as works of art loaned or leased and currently in any location, including but not limited to the individual items listed on Exhibit E hereto, and including any and all Intellectual Property in and to the Artwork that is owned by the Debtor as well as any documentation relating to the authenticity, provenance, ownership and title of the works of art. For the avoidance of doubt, the Artwork will include all the works of art owned by the Debtor wherever located, whether on display or in storage either by the Debtor or by any third party, including whether such works of art were loaned or leased to any third party under any type of agreement, consignment or otherwise.   For the avoidance of doubt, Artwork excludes the Archive, the Archive Intellectual Property, and the Name Rights.

(k)      "Assignment of Copyrights" has the meaning specified in Section 4.3(b).

(l)      "Assignment of Trademarks" has the meaning specified in Section 4.3(b).

(m)      "Assumed Contracts" has the meaning specified in Section 2.1(j).

(n)      "Assumed Leases" has the meaning specified in Section 2.1(k).

(o)      "Assumed Liabilities" has the meaning specified in Section 2.3.

(p)      "Assumption and Assignment Agreement" has the meaning specified in Section 2.3.

(q)      "Assumption and Assignment of Leases" has the meaning specified in Section 4.3(g).

(r)      "Auction" has that meaning ascribed to such term by the Bidding Procedures Order.

(s)      "Avoidance Actions" means any and all claims for relief of Debtor and Seller under chapter 5 of the Bankruptcy Code, only to the extent they relate to any counterparty with which the Purchaser intends to conduct business after the Closing, which consists of the counterparties listed on Exhibit F hereto.

(t)      "Bankruptcy Case" means the case commenced by Debtor under chapter 7 of the Bankruptcy Code pending before the Bankruptcy Court at case number 19-10236.

(u)      "Bankruptcy Code" means title 11 of the United States Code, sections 101 *et. seq.*

(v)      "Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Illinois,  Eastern Division.

(w)      "Bidding Procedures" means the bidding procedures approved by the Bankruptcy Court pursuant to the Bidding Procedures Order, on June 20, 2019.

(x)      "Bidding Procedures Order" means the order of the Bankruptcy Court entered on June 20, 2019 [Dkt. No. 77] and any supplement or amendment thereto.

(y)      "Bill of Sale" has the meaning specified in Section 4.3(a).

(z)      "Books" means the corporate, operational and general books and records of the Debtor.

(aa)     "Business Day" means any day of the year on which national banking institutions in New York, New York are open to the public for conducting business and are not required or authorized to close.

(bb)     "Closing" has the meaning specified in Section 4.1.

(cc)     "Closing Date" has the meaning specified in Section 4.1.

(dd)     "COBRA" has the meaning set forth in Section 2.4(j).

(ee)     "Code" means the United States Internal Revenue Code of 1986, as amended.

(ff)     "Computers" means all computer equipment and hardware, including all central processing units, terminals, disk drives, tape drives, electronic memory units, printers, keyboards, screens, peripherals (and other input/output devices), modems and other communication controllers, and any and all parts and appurtenances thereto.

(gg)     "Contract" means any agreement, contract, obligation, promise, instrument, undertaking or other arrangements (whether written or oral), including but not limited to employment contracts, consulting contracts, independent contractor agreements, consents, releases, authorizations, permissions, license agreements, assignments and/or other transfers of Copyrights, Trademarks and/or other Intellectual Property, and any amendment thereto, that is legally binding, other than a Lease, to which Debtor is a party.

(hh)     "Copyright Office" means the United States Copyright Office.

(ii)     "Copyrights" means all United States and foreign copyrights and copyrightable subject matter, whether registered or unregistered, including all United States copyright registrations and applications for registration and foreign equivalents, all moral rights, all common-law copyright rights, and all rights to register and obtain renewals and extensions of

-4-

copyright registrations, together with all other copyright rights accruing by reason of any international copyright convention.

(jj)  "Couture Collection" means the collection of gowns and dresses owned by Debtor.

(kk)  "Cure Costs" has the meaning specified in Section 2.3(a).

(ll)  "Debtor" has the meaning specified in the preamble.  For the avoidance of doubt, to the extent any of the Purchased Assets are owned by, or licensed to, Fashion Fair Beauty Products Limited, Fashion Fair LLC or Fashion Fair Direct LLC, or any other Affiliate of the Debtor, the Debtor shall have effectuated the transfer of any such ownership or other rights from such entities prior to the Closing and the Debtor's rights in the Purchased Assets shall be fully vested and transferable to the Purchaser pursuant to this Agreement.

(mm)  "Debtor's Books" means the collection of books owned by Debtor.  For the avoidance of doubt, Debtor's Books excludes the Archive, the Archive Intellectual Property, and the Name Rights.

(nn)  "Debtor's Certificate" means the Certificate of Linda Johnson Rice certifying certain representations related to the Debtor as set forth in Section 5 hereof, in substantially the form of Exhibit F-1  hereto.

(oo)  "Deposit" means the Purchaser's deposit in the amount of $1,500,000.00, which shall be applied to the Purchase Price at Closing or otherwise paid as set forth in Section 9.2.

(pp)  "Disclosure Schedules" means the disclosure schedules attached hereto that Seller has prepared and delivered to Purchaser pursuant to the terms of this Agreement, setting forth information regarding the Purchased Assets, the Assumed Liabilities and other matters with respect to Debtor as set forth therein.

(qq)  "Documents" means all Debtor's Books, records, files, invoices, inventory records, product specifications, advertising materials, customer lists and sales records, cost and pricing information, supplier lists and purchase records, business plans, catalogs, customer literature, quality control records and manuals, research and development files, records and laboratory books and credit records of customers (including all data and other information stored on discs, tapes or other media), in each case to the extent relating to the Purchased Assets or the Assumed Liabilities.

(rr)  "Domain Names" means any alphanumeric designation registered with or assigned by a domain name registrar, registry or domain name registration authority as part of an electronic address on the Internet, including johnsonpub.com, johnsonpublishing.com, and johnsonpublishingcompany.com.

(ss)  "Encumbrance" means any interest, charge, lien, claim (as defined in section 101(5) of the Bankruptcy Code), mortgage, sublease, hypothecation, deed of trust,

pledge, security interest, option, right of use, first offer or first refusal, easement, servitude, restrictive covenant, encroachment, encumbrance, or other similar restriction of any kind.

(tt)    "Equipment" means all furniture, fixtures, equipment, Computers, machinery, apparatus, appliances, spare parts, signage, supplies, vehicles, forklifts and all other tangible personal property of every kind and description in which Debtor has an interest.

(uu)    "ERISA" has the meaning set forth in Section 2.4(i).

(vv)    "Excluded Assets" has the meaning specified in Section 2.2.

(ww)    "Excluded Contracts" has the meaning specified in Section 2.2(l).

(xx)    "Excluded Leases" has the meaning specified in Section 2.2(m).

(yy)    "Excluded Liabilities" has the meaning specified in Section 2.4.

(zz)    "Fashion Fair Assets" means the assets relating to the Fashion Fair Cosmetics line of cosmetics business, including existing raw material, in-process and finished inventories, contracts, marketing materials, existing accounts receivable and all Copyrights, Trademarks, trade dress, Patents, formulations, trade secrets, and other Intellectual Property associated exclusively with the manufacturing, distribution, sale and marketing of the beauty, cosmetic and any other lines under the Fashion Fair Cosmetics brands and all other related brands.  For the avoidance of doubt, the Fashion Fair Assets (i) include all the rights relating to the names, tradenames and Trademarks "FASHION FAIR," "FASHION FAIR COSMETICS" and "FASHION FAIR FASHION SHOW" and any of their related uses, including commercial use and (ii) excludes the Archive, the Archive Intellectual Property, and the Name Rights.

(aaa)    "Filing" means the filing of a petition with the Bankruptcy Court under chapter 7 of the Bankruptcy Code commencing the Bankruptcy Case.

(bbb)    "GAAP" means generally accepted accounting principles in the United States.

(ccc)    "Governmental Authority" means any federal, state, local or foreign governmental entity or any subdivision, agency, instrumentality, authority, department, commission, board, bureau, official or other regulatory, administrative or judicial authority thereof or any federal, state, local or foreign court, tribunal or arbitrator or any self-regulatory organization, agency or commission.

(ddd)    "Indebtedness" of any Person means, without duplication: (i) the principal of and premium (if any) in respect of (A) indebtedness of such Person for borrowed money and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments the payment of which such Person is responsible or liable; (ii) all obligations of such Person for the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement; (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit

transaction; (v) all obligations of such Person under interest rate or currency swap transactions (valued at the termination value thereof); and (vi) all obligations of the type referred to in clauses (i) through (v) of any Persons the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise.

(eee)    "Intellectual Property" means all intellectual property rights of any kind owned, used, held for use, or licensed (as licensor or licensee) by Debtor, including all Software, Copyrights, Trademarks, Trade Secrets, trade dress, all rights to publicity, privacy and personal information, and all rights and remedies related thereto (including the right to sue for and recover damages, profits and any other remedy in connection therewith) for past, present or future infringement, misappropriation or other violation relating to any of the foregoing.

(fff)    "Knowledge of Debtor," "to the Debtor's Knowledge" and words of similar import shall mean the actual knowledge of Linda Johnson Rice,  including but not limited to, from her general experience and history with the Debtor, without a duty of inquiry.

(ggg)    "Knowledge of Seller" or "to the Seller's Knowledge" and words of similar import shall mean the actual knowledge of Miriam R. Stein, as the chapter 7 trustee herein,  including but not limited to, from her general experience and history with the Bankruptcy Case, without any duty of inquiry.

(hhh)    "Laws" means any applicable law however arising, including without limitation federal or state common law, statute, ordinance or regulation.

(iii)    "Leased Real Property" means the leased real property, including any improvements to such Leased Real Property.

(jjj)    "Leases" means leases with respect to the Leased Real Property.

(kkk)    "Legal Requirement" means any federal, state, provincial, local, municipal, foreign, international, multinational, or other administrative Order, constitution, law, ordinance, principle of common law, regulation, statute or treaty.

(lll)    "Liability" means any debt, loss, claim (as defined in section 101(5) of the Bankruptcy Code), damage, demand, fine, judgment, penalty, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability, successor liability or otherwise), and including all costs and expenses relating thereto (including fees and expenses of legal counsel, experts, engineers and consultants and costs of investigations).

(mmm)    "Magazines" means the physical copies of the magazines previously published by the Debtor, including without limitation Ebony, Jet, Ebony Man, Ebony Jr., Ebony South Africa, Black Stars, Negro Digest/Black World, Hue, Ebony Africa, Tan/Tan Confessions, Copper Romance and Beauty Salon (as listed on page 3 of Schedule AB-42.5 filed at Docket 37-7).  A list of the Magazines is attached at Exhibit G.

(nnn)  "Material Adverse Effect" means (a) any fact, condition, change, violation, inaccuracy, circumstance, effect or event, individually or in the aggregate, that has, or would be reasonably expected to have, a material adverse effect on the property, assets (tangible and intangible), or condition (financial or otherwise) of the Purchased Assets or the ability of Seller to perform any of its material obligations under this Agreement or the Ancillary Documents to which it is a party, other than: (i) the effect of any change resulting from any action taken by Purchaser or its Affiliates with respect to the transactions contemplated hereby or with respect to Seller; (ii) any effect resulting from the filing or prosecution of the Bankruptcy Case; (iii) the effect of any change that generally affects any industry in which Debtor operated; (iv) the effect of any change arising in connection with earthquakes, hostilities, national calamities, acts of war, acts of God, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, national calamities, acts of war, acts of God, political conditions, sabotage or terrorism or military actions existing or underway as of the date hereof; (v) the effect of any change in applicable law or GAAP or interpretation thereof; (vi) any actions or inactions by Seller and Debtor contrary to this Agreement or the consummation of the transactions contemplated by this Agreement; (vii) general economic, political or financial market conditions; or (viii) the effect of any alleged ownership claims to any of the Purchased Assets as listed on or described in Schedule 5.5 hereto.

(ooo)  "Name Rights" means the non-exclusive right to use the name "Johnson Publishing Company LLC" in connection with the Archive and the Archive Intellectual Property and any related use, including commercial use.

(ppp)  "Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Authority.

(qqq)  "Other Consents" has the meaning specified in Section 2.5(c).

(rrr)  "Party" or "Parties" means, individually or collectively, Purchaser and Seller, as applicable.

(sss)  "Patent" means any patent arising under or protected by any applicable law, including Title 35 of the United States Code.

(ttt)  "Permitted Access Parties" has the meaning specified in Section 7.9.

(uuu)  "Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, Governmental Authority or other entity.

(vvv)  "Petition Date" means April 9, 2019, the date on which the Debtor's Filing occurred.

(www)  "Post-Close Filings" has the meaning specified in Section 7.9.

(xxx)  "Proceeding" means any legal action, arbitration, audit, claim, cause of action, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or

investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

(yyy)   "Purchase Price" has the meaning specified in Section 3.1.

(zzz)   "Purchased Assets" has the meaning specified in Section 2.1.

(aaaa) "Purchased Deposits" means, solely with respect to the Archive and Archive Intellectual Property, all deposits (including customer deposits and security deposits for rent and electricity (including such deposits made by Seller or Debtor in connection with the Assumed Leases)) and prepaid charges and expenses of Seller or Debtor, other than any deposits or prepaid charges and expenses paid in connection with or relating exclusively to any Excluded Assets or any Excluded Liability.

(bbbb) "Purchaser" has the meaning specified in the preamble.

(cccc)   "Representative" means with respect to a particular Person, any duly authorized director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

(dddd) "Sale Order" means an Order of the Bankruptcy Court, in substantially the form attached as Exhibit A hereto or as otherwise agreed by Purchaser and Seller, pursuant to, inter alia, sections 105, 363 and 365 of the Bankruptcy Code (i) authorizing and approving, inter alia, the sale of the Purchased Assets to Purchaser on the terms and conditions set forth herein free and clear of all Liabilities and Encumbrances, the assumption and assignment of the Assumed Liabilities, and the assumption and assignment of the Assumed Contracts and Assumed Leases to Purchaser and (ii) containing certain findings of facts, including a finding that Purchaser is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code.

(eeee)   "Seller" has the meaning specified in the preamble.

(ffff)     "Software" means all computer software programs (whether in source code, object code, or other form) and systems, databases and platforms owned, licensed or used by Debtor, including all databases, compilations, tool sets, compilers, higher level or "proprietary" languages, related documentation, technical manuals and materials, and any licenses to use or other rights relating to the foregoing.

(gggg) "Tax" or "Taxes" (and with correlative meaning, "Taxable" and "Taxing") means (i) any federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental, natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar taxes, duty, levy or other governmental charge or assessment or deficiencies thereof (including all interest and penalties

thereon and additions thereto whether disputed or not) and (ii) any transferee liability in respect of any items described in clause (i) above.

(hhhh) "Tax Return" means any return, report or similar statement required to be filed with respect to any Taxes (including any attached schedules), including any information return, claim for refund, amended return or declaration of estimated Tax.

(iiii)    "Third Party Consents" has the meaning specified in Section 5.4.

(jjjj)    "Trademarks" means United States, state and foreign trademarks, service marks, logos and other design marks, slogans, trade dress and trade names (including all assumed or fictitious names under which the Debtor's business as it relates to the Purchased Assets was conducted), and any other indicia of source of goods and services, designs and logotypes related to the above, in any and all forms, whether registered or unregistered, and registrations and pending applications to register the foregoing (including intent to use applications), and all goodwill related to or symbolized by the foregoing.

(kkkk) "Trade Secrets" means confidential or proprietary information and trade secrets (including ideas, research and development, know-how, formulae, compositions, processes and techniques, technical data, designs, drawings, specifications, pricing and cost information, and business and marketing plans and proposals).

## 1.2    Other Definitional and Interpretive Matters.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)    Dollars.  Any reference in this Agreement to $ means U.S. dollars.

(iii)    Exhibits/Schedules. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)    Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)    Headings. The provision of a Table of Contents, the division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this

Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(vi)     Herein. The words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)     Including. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)     No Strict Construction. The Parties participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## SECTION 2
## PURCHASE AND SALE

**2.1     Purchased Assets.**

Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date, Seller shall, on a strictly "quitclaim" basis, sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Purchaser, and Purchaser shall purchase all of Seller's, the Debtor's and the Estate's right title and interest in and to the following (all of such following assets or property, solely to the extent of all of the interests of Seller, the Debtor and the Estate therein, being herein referred to as the "Purchased Assets"):

(a)     the Archive;

(b)     the Archive Equipment (if any);

(c)     the Archive Intellectual Property;

(d)     the Name Rights;

(e)     all Account Receivables (if any);

(f)     all Purchased Deposits (if any);

(g)     copies of the Books, minute books, stock ledgers, corporate seals and stock certificates of Debtor, to the extent related to the Purchased Assets;

(h)     all rights to proceeds under insurance policies relating to claims for losses related to the Purchased Assets or any Assumed Liability;

-11-

(i)      all rights, claims, refunds, causes of action, choses in action, rights of recovery and rights of setoff of Debtor relating solely to the Archive and the Archive Intellectual Property against third parties arising out of events occurring prior to the Closing Date, including, all Avoidance Actions, excluding only the rights, claims, refunds, causes of action, choses in action, rights of recovery and rights of setoff that are identified as Excluded Assets in Section 2.2;

(j)      all Contracts listed or described on Schedule 2.1(j) (the "Assumed Contracts");

(k)      all Leases of Leased Real Property listed or described on Schedule 2.1(k), including any improvements to such Leased Real Property (such Leases, the "Assumed Leases");

(l)      all Documents relating to the Archive and the Archive Intellectual Property;

(m)      all goodwill and other intangible assets associated with the Purchased Assets;

(n)      all advertising, marketing and promotional materials, studies, reports and all other printed or written materials relating to the Purchased Assets; and

(o)      all other or additional assets, properties, privileges, rights (including prepaid expenses) and interests of Debtor used primarily in connection with the Archive of every kind and description and wherever located, whether known or unknown, fixed or unfixed, accrued, absolute, contingent or otherwise, and whether or not specifically referred to in this Agreement; provided, however, none of the Parties hereto intends that Purchaser, or any of its Affiliates, shall be deemed to be a successor to Debtor with respect to Purchased Assets, including all Excluded Assets.

**2.2    Excluded Assets.**

Notwithstanding any provision in this Agreement to the contrary, other than the Purchased Assets, Purchaser expressly acknowledges and agrees that it is not purchasing or acquiring, and Seller is not selling or assigning, any other assets or properties or claims or causes of action of Debtor or the Trustee, and all such other assets and properties shall be excluded from the Purchased Assets (the "Excluded Assets"). Excluded Assets include, without limitation, all property or assets of every nature not expressly included in the Purchased Assets, including the following assets and properties of Debtor:

(a)      all cash and cash equivalents, including commercial paper, treasury bills, certificates of deposit and other bank deposits of Debtor;

(b)      the Artwork;

(c)      the Fashion Fair Assets;

(d)      the Couture Collection;

(e)      the Debtor's Books (except that Purchaser may obtain copies of any Debtor's Books that pertain to the Purchased Assets);

(f)      any Domain Names;

(g)      the rights to the name "Johnson Publishing Company LLC" and derivatives thereof, except to the extent of the Name Rights;

(h)      the Equipment, other than the Archive Equipment;

(i)      all shares of capital stock or other equity interests of Debtor or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests of Debtor;

(j)      all right, title and interest of Debtor in, to or under all of the properties and assets of Debtor (other than the Purchased Assets) of every kind and description, wherever located, real, personal or mixed, tangible or intangible, owned, leased, licensed, used or held for use;

(k)      all originals of the minute books, stock ledgers, corporate seals and stock certificates of Debtor;

(l)      all Contracts (and rights thereunder) not listed or described in Schedule 2.1(j) (the "Excluded Contracts");

(m)      all Leases (and rights thereunder) not listed or described in Schedule 2.1(k) (the "Excluded Leases");

(n)      all rights, claims or causes of action of Seller under this Agreement or the Ancillary Documents;

(o)      all receivables, rights, claims, refunds, causes of action, choses in action, rights of recovery and rights of setoff related exclusively to any Excluded Asset or any Excluded Liability;

(p)      all insurance policies, including rights under director and officer liability policies, ERISA and trustee liability policies and employment practices liability policies, and all rights under insurance policies (including all rights to proceeds under insurance policies) relating to claims for losses related exclusively to any Excluded Asset or Excluded Liability to the extent applicable;

(q)      all Documents (A) relating exclusively to any Excluded Asset or any Excluded Liability, (B) relating to employees of Debtor, or (C) other books and records that Seller is required by applicable law to retain or that Seller determines are necessary to retain including Tax Returns, financial statements, and corporate or other entity filings (provided, however, that Purchaser shall have, to the extent allowed by applicable law, the right to make copies of any portions of such retained books and records that relate to the Purchased Assets or the Assumed Liabilities);

-13-

(r)        all deposits or prepaid charges and prepaid expenses paid relating exclusively to any of the Excluded Assets or any Excluded Liability;

(s)        any and all claims and causes of action of Seller arising under the Bankruptcy Code or similar federal, state or local laws, including under Chapter 5 of the Bankruptcy Code and similar state laws, other than the Avoidance Actions;

(t)        all reports of accountants, investment bankers, crisis managers, turnaround consultants and financial advisors or consultants;

(u)        any copyrights or other property not owned by the Debtor, the Estate or the Seller; and

(v)        all tangible assets located at Debtor's principal place of business and any Leased Real Property which are not owned by Debtor.

**2.3    Assumed Liabilities.**

Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date, Purchaser shall execute and deliver to Seller an assumption and assignment agreement in the form attached hereto as <u>Exhibit B</u> or such other form as may be in form and substance reasonably satisfactory to Seller and Purchaser (the "<u>Assumption and Assignment Agreement</u>") pursuant to which Purchaser shall assume and agree to discharge, when due (in accordance with its respective terms and subject to the respective conditions thereof), only the following Liabilities (without duplication) (collectively, the "<u>Assumed Liabilities</u>"):

(a)        all of the obligations of Debtor under the Assumed Contracts and Assumed Leases to the extent required by section 365(b) of the Bankruptcy Code (in the amounts set forth on <u>Schedule 2.3(a)</u> or as otherwise agreed by Purchaser and the counterparties to such Assumed Contracts and Assumed Leases) (the "<u>Cure Costs</u>"); and

(b)        all Liabilities under the Assumed Contracts and the Assumed Leases arising at or after the Closing Date.

Notwithstanding anything in this Agreement to the contrary, by written notice to Seller delivered not later than two (2) days prior to the Closing, Purchaser in its sole discretion may remove any Assumed Contract set forth on <u>Schedule 2.1(j)</u> and/or any Assumed Lease set forth on <u>Schedule 2.1(k)</u>, in which event any such removed Contract and Lease shall be deemed to be an Excluded Contract or an Excluded Lease, as applicable, and an Excluded Asset and any Cure Cost or Liability associated therewith shall be deemed to be an Excluded Liability.

**2.4    Excluded Liabilities.**

Except as otherwise expressly set forth herein, and subject to <u>Section 2.7</u> hereof, Purchaser shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Liability of Seller or Debtor, and Seller and Debtor shall be solely and exclusively liable with respect to all Liabilities of Seller and Debtor, other than the Assumed Liabilities (collectively the "<u>Excluded Liabilities</u>"). Notwithstanding anything else to the

-14-

contrary herein, except as expressly set forth as Assumed Liabilities in <u>Section 2.3</u>, Purchaser is not assuming or in any way becoming liable for any of the Seller's or the Debtor's debts, liabilities or, subject to <u>Section 2.7</u>, obligations, whether known, unknown, absolute, contingent, matured or unmatured, regardless of whether any of the foregoing relate to the Purchased Assets. For the avoidance of doubt, the Excluded Liabilities include, but are not limited to, the following (except to the extent expressly included in the Assumed Liabilities herein):

(a)     any Liability of Debtor or Seller, arising out of, or relating to, this Agreement or the transactions contemplated by this Agreement, whether incurred prior to, at or subsequent to the Closing Date, including all finder's or broker's fees and expenses and any and all fees and expenses of any Representatives of Debtor or Seller;

(b)     any Liability relating to (x) events or conditions occurring or existing in connection with, or arising out of, the Debtor's business, or (y) the ownership, possession, use, operation or sale or other disposition prior to the Closing Date of any Purchased Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Debtor's business);

(c)     any Liability for Taxes (i) attributable to periods or portions thereof as determined pursuant to <u>Section 7.5(a)</u> ending on or prior to the Closing Date, (ii) of Debtor or Seller, or any member of any consolidated, affiliated, combined or unitary group of which Debtor is or has been a member, for Taxes and (iii) of any other Person pursuant to an agreement or otherwise;

(d)     any Liability incurred by Seller, Debtor or Debtor's directors, officers, stockholders, agents or employees (acting in such capacities) on or after the Closing Date;

(e)     any Liability of Debtor or Seller to any Person on account of any Action or Proceeding;

(f)     any Liability relating to or arising out of the ownership or operation of an Excluded Asset;

(g)     any Liability or obligation of Debtor or Seller under any Indebtedness, including any Indebtedness owed to any stockholder, subsidiary or other Affiliate of Debtor, and any Contract evidencing any such Indebtedness;

(h)     any collective bargaining agreements or employee benefit plans of Debtor;

(i)     all Liabilities relating to or arising out of any pension, "multiemployer plan" (as such term is defined in Section 3(37) or Section 4001(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>")), health or welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any  "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) sponsored, maintained, contributed to, or required to be contributed to, by Debtor or any multiemployer plan to which Debtor has at any time contributed to, has or had an obligation to contribute to, or has or had any Liabilities or potential Liabilities including, but not limited to, any multiemployer "withdrawal liability" (within the meaning of Section 4201 of ERISA);

-15-

(j)      any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (i) ERISA, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (vii) the Americans with Disabilities Act of 1990, (viii) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code and of any similar state Law (collectively, "COBRA"), (ix) the Occupational Safety and Health Act, (x) state or local discrimination Laws, (xi) federal, state or local Laws regarding terms and conditions of employment, including wages and wage payment, (xii) state unemployment compensation Laws or any other similar state Laws, including wages and wage payment, (xiii) the Worker Adjustment and Retraining Notification Act, or any other similar state or local Law regarding mass layoffs or plant closings or (xiv) any other state or federal benefits or claims relating to any employment with Debtor or Seller or any of their predecessors; and

(k)      fees or expenses of Debtor or Seller incurred with respect to the transactions contemplated herein.

**2.5      Assignments.**

(a)      Seller and Debtor shall transfer and assign all Assumed Contracts and Assumed Leases to Purchaser, and Purchaser shall assume all Assumed Contracts and Assumed Leases from Seller and Debtor, as of the Closing Date pursuant to section 365 of the Bankruptcy Code and the Sale Order.

(b)      The Sale Order shall provide that, as of the Closing, Seller and Debtor shall assign to Purchaser the Assumed Contracts and Assumed Leases and the Assumed Contracts and Assumed Leases shall be identified by the name and date of the Assumed Contract or Assumed Lease, the other party to the Assumed Contract or Assumed Lease, as the case may be, and the address of such party for notice purposes, all included on an exhibit attached to either the motion filed in connection with the Sale Order or a motion for authority to assume and assign such Assumed Contracts and Assumed Leases. Such exhibit shall also (i) set forth the amounts necessary to cure any defaults under each of the Assumed Contracts and Assumed Leases as determined by Seller based on Debtor's books and records or as otherwise determined by the Bankruptcy Court, and (ii) delineate a procedure for transferring to Purchaser the rights to any security deposits in the form of cash or letters of credit on deposit with the other party to any Assumed Lease.

(c)      In the case of Leases, Contracts and other commitments included in the Purchased Assets that cannot be transferred or assigned effectively without the consent of third parties, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), Debtor and Seller shall, subject to any approval of the Bankruptcy Court that may be required and the terms set forth in Section 7.4, reasonably cooperate with Purchaser in endeavoring to obtain such consent (all such consents, whether obtained prior to or after the Closing being referred to herein as the "Other Consents") and in

providing Purchaser with the benefits and burdens of the consummation of such transfers and assignments.

### 2.6   Further Assurances.

(a)   At the Closing, and at all times thereafter as may be necessary, Seller and Purchaser shall execute and deliver such other instruments of transfer as shall be reasonably necessary to vest in Purchaser title to the Purchased Assets free and clear of all Liabilities and Encumbrances, and such other instruments as shall be reasonably necessary to evidence the assignment by Seller and the assumption by Purchaser or its designee of the Purchased Assets and Assumed Liabilities, including the Assumed Contracts and Assumed Leases. Seller and Purchaser shall cooperate with one another to execute and deliver such other documents and instruments as may be reasonably required to carry out the transactions contemplated hereby, except that Seller shall not be required to take any action or execute any document to the extent Seller determines or the Court finds that any such action or execution of any such document would violate any applicable law.

(b)   At the Closing, and at all times as may be necessary thereafter, Seller shall, at the reasonable request of Purchaser, execute, deliver, and file, or cause to be executed, delivered, and filed, such other instruments of conveyance and transfer and, to the extent that Seller has the personnel, funding and documentation required to do so, take such other actions as Purchaser may reasonably request, in order to more effectively consummate the transactions contemplated by this Agreement and to vest in Purchaser all of the Debtor's, the Estate's and Seller's right, title and interest in and to the Intellectual Property included in the Purchased Assets, including executing, filing, and recording, with all appropriate intellectual property registration authorities and other relevant entities, all assignment instruments and other filings that are necessary to correctly record the transfer of title to Purchaser with respect to ownership of the Intellectual Property included in the Purchased Assets; provided, however, that (i) after the Closing any out of pocket expenses incurred by Debtor in the fulfillment of any such request shall be borne by Purchaser and (ii) Seller shall not be required to take any action at any time, upon request of Purchaser or otherwise, that Seller determines or a Court finds would violate any applicable law.

### 2.7   "As Is, Where Is", "Quitclaim" Transaction.

NOTWITHSTANDING ANY OTHER PROVISION HEREOF TO THE CONTRARY, PURCHASER ACKNOWLEDGES AND AGREES THAT IT IS PURCHASING THE PURCHASED ASSETS ON A STRICTLY "AS IS, WHERE IS", "QUITCLAIM" BASIS AND THAT, THEREFORE, IN CONVEYING THE PURCHASED ASSETS TO PURCHASER, SELLER (I) IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES AS TO THE PURCHASED ASSETS OTHER THAN THEIR EXISTENCE, OR AS OTHERWISE EXPRESSLY SET FORTH HEREIN, AND (II) DISCLAIMS ALL WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE AND MERCHANTABILITY AS TO THE PURCHASED ASSETS EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN.  PURCHASER IS ASSUMING ALL RISK OF POTENTIAL THIRD PARTY CLAIMS TO OWNERSHIP OF OR RIGHTS TO ANY OF THE PURCHASED ASSETS BY

ENTITIES OR PERSONS OTHER THAN THE DEBTOR, EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN OR AS ORDERED BY THE COURT.

## SECTION 3
## PURCHASE PRICE

**3.1** **Purchase Price.**

(a) Concurrently with the execution hereof Purchaser has delivered the Deposit to the Seller in cash.

(b) Subject to the terms and conditions set forth in this Agreement and in reliance upon the representations and warranties of the Parties set forth herein, at the Closing, the purchase price to be paid by Purchaser to Seller in exchange for the Purchased Assets (the "Purchase Price") shall be the sum of the following:

(i) The amount of the Deposit; plus

(ii) Cash in the amount of $28,500,000 (such amount, the "Cash Balance"); plus

(iii) the assumption by Purchaser of the Assumed Liabilities.

**3.2** **Closing Date Payment.**

At the Closing, Purchaser shall satisfy the Purchase Price as follows:

(a) Purchaser shall deliver the Cash Balance via wire transfer of immediately available funds to the account(s) designated by Seller and the Deposit shall be released to Seller;

(b) Purchaser shall pay directly to the obligees identified on Schedule 2.3(a) all of the Cure Costs, respectively, and Seller shall have no liability for any Cure Costs; and

(c) with respect to the Assumed Liabilities, by Purchaser assuming such Assumed Liabilities at the Closing; provided, however, that to the extent any such Assumed Liabilities are able to be satisfied at Closing, Purchaser may satisfy such Assumed Liabilities at Closing in Purchaser's sole discretion.

## SECTION 4
## THE CLOSING

**4.1** **Closing Date.**

Upon the terms and conditions set forth in this Agreement the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities contemplated hereby (the "Closing") shall take place at the offices of Fox Swibel Levin & Carroll LLP, 200 West Madison Street, Suite 3000, Chicago, Illinois 60606, or by electronic delivery of required Closing items, as promptly as practicable, and at no time later than July 26, 2019, or at such other place or time

as Purchaser and Seller may mutually agree. The date and time at which the Closing actually occurs is hereinafter referred to as the "<u>Closing Date</u>."

**4.2** **Purchaser's Deliveries.**

At or prior to the Closing, Purchaser shall deliver to Seller:

(a) the Assumption and Assignment Agreement, and each other Ancillary Document to which Purchaser is contemplated to be a party, duly executed by Purchaser;

(b) the Cash Balance;

(c) the certificates required to be delivered pursuant to <u>Section 8.2(a)</u> and any written waiver required to be delivered pursuant to <u>Section 8.2(b)</u>; and

(d) such other assignments and other good and sufficient instruments of assumption and transfer, in form reasonably satisfactory to Seller, as Seller may reasonably request to transfer and assign the Assumed Liabilities to Purchaser.

**4.3** **Seller's Deliveries.**

At or prior to the Closing, Seller shall deliver to Purchaser:

(a) a bill of sale in the form attached hereto as <u>Exhibit  C</u> or such other form as may otherwise be satisfactory to Seller and Purchaser (the "<u>Bill of Sale</u>") and any required assumption and assignment agreement and each other Ancillary Document to which Seller is contemplated to be a party, duly executed by Seller;

(b) instruments of assignment, in the form attached hereto as <u>Exhibit H</u> or such other form as may be in form and substance reasonably satisfactory to Purchaser, of the Trademarks (the "<u>Assignment of Trademarks</u>") and Copyrights (the "<u>Assignment of Copyrights</u>") that are owned by Debtor and included in the Purchased Assets, if any, duly executed by Seller, in form for recordation with the appropriate Governmental Authorities, in form reasonably acceptable to the Parties, and any other assignments or instruments with respect to any Intellectual Property included in the Purchased Assets for which an assignment or instrument is required to assign, transfer and convey such assets to Purchaser;

(c) evidence of receipt of the Other Consents and Third Party Consents to the extent such consents are not provided for or satisfied by the Sale Order;

(d) a copy of the Sale Order;

(e) the certificates required to be delivered pursuant to <u>Sections 8.2(a)</u> and <u>8.2(b)</u>;

(f) certificates executed by Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that Seller and/or Debtor is not a foreign person within the meaning of Section 1445(f)(3) of the Code;

-19-

(g)      instruments of assumption and assignment of the Assumed Leases in form reasonably acceptable to the Parties (the "<u>Assumption and Assignment of Leases</u>"), duly executed by Seller, in form for recordation with the appropriate public land records, if necessary, and any other related documentation or instruments with respect to any Assumed Lease;

(h)      (i) all lease files for the Assumed Leases, including copies of any plans, specifications, warranties and other documents related thereto, and (ii) keys for the Leased Real Property and the access codes for any electronic security system located at the Leased Real Property which is the subject of an Assumed Lease;

(i)      all instruments and documents necessary to release any and all Liabilities and Encumbrances, including appropriate UCC financing statement amendments (termination statements);

(j)      possession of the Purchased Assets together with such keys, passwords, combinations, lock and safe combinations and other similar items as Purchaser shall require to obtain immediate and full occupation and control of the Purchased Assets (and should Seller, Debtor or Purchaser determine that any Purchased Assets are still in the possession of Seller or Debtor after the Closing, Seller or Debtor shall promptly deliver them to Purchaser); and

(k)      such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Purchaser, as Purchaser may reasonably request to vest in Purchaser all the right, title and interest of Seller in, to or under any or all the Purchased Assets.

**SECTION 5**
**<u>REPRESENTATIONS AND WARRANTIES OF SELLER</u>**

As an inducement to Purchaser to enter into this Agreement and to consummate the transactions contemplated hereby, except as set forth in the Disclosure Schedules, Seller, in reliance on the Debtor's Certificate as to representations below that relate to the Debtor, represents and warrants to Purchaser solely to the Seller's Knowledge as follows:

**5.1      <u>Organization of Debtor.</u>**

Debtor is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. Debtor is in good standing in each jurisdiction in which the ownership or leasing of its properties or the conduct of its businesses requires such qualification, except where failure to so qualify or be in good standing would not reasonably be expected to have a Material Adverse Effect.

**5.2      <u>Subsidiaries and Investments.</u>**

Except as set forth on <u>Schedule 5.2</u>, Seller does not directly or indirectly, own, of record or beneficially, any outstanding voting securities, membership interests or other equity interests in any Person.

**5.3**      <u>Authority of Seller.</u>

Upon entry of the Sale Order, Seller will have full power and authority as trustee to execute, deliver and perform its obligations under, and consummate the transactions contemplated by, this Agreement and each of the Ancillary Documents to which Seller is (or will be) a party.

**5.4**      <u>Consents and Approvals.</u>

Other than the Sale Order, <u>Schedule 5.4</u> sets forth a true and complete list of each material consent, waiver, authorization or approval of any Person (including any Governmental Authority), and each declaration to or filing or registration with any such Person, that is required in connection with the execution and delivery of this Agreement and the Ancillary Documents by Seller or the performance by Seller of its obligations thereunder (the "<u>Third Party Consents</u>").

**5.5**      <u>Title to Purchased Assets</u>.

Upon delivery to Purchaser on the Closing Date of the instruments of transfer contemplated by <u>Section 4.3</u>, Seller will thereby transfer to Purchaser, all of Seller's, the Estate's and Debtor's right, title and interest in and to the Purchased Assets free and clear of all Liabilities and Encumbrances. Other than the alleged ownership claims to the Purchased Assets listed on <u>Schedule 5.5</u>, there are no ownership claims to any Purchased Assets. Neither Seller nor Debtor has contracted with any Person other than Purchaser to acquire the Purchased Assets.

**5.6**      <u>Schedule of Archive Intellectual Property.</u>

<u>Schedule 5.6</u> sets forth an accurate and complete list of all registered Archive Intellectual Property owned by Debtor and all pending applications therefor.

**5.7**      <u>No Government Violations.</u>

Except as set forth on <u>Schedule 5.7</u>, Debtor has not been cited, warned or investigated for any Occupational Safety and Health Administration, Federal Trade Commission, state attorney general and/or any other federal or state governmental violations and there is no fact or event which, with the passage of time, will give rise to a citation or violation.

**5.8**      <u>No Pending or Threatened Suits.</u>

Except as set forth on <u>Schedules 5.5 or 5.8</u>,there are no Actions or Proceedings existing or threatened against Debtor and Seller relating to the Purchased Assets. There are no Actions or Proceedings existing or threatened against Debtor and Seller relating to the Purchased Assets which would reasonably be expected to have a Material Adverse Effect.

**5.9**      <u>Condition of the Assets.</u>

Debtor and Seller have maintained the Purchased Assets in the ordinary course of business. Seller has obtained the insurance policies with respect to the Purchased Assets set forth on <u>Schedule 5.9</u> and such policies of insurance remain in full force and effect. There has

not been any material loss, damage or destruction to any of the Purchased Assets (whether or not covered by insurance).

**5.10**    **No Finder.**

Except for the Seller's retention of Hilco Streambank, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Debtor or Seller in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment from Purchaser in respect thereof based on any acts by or on behalf of Debtor or Seller.

**SECTION 6**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

As an inducement to Seller to enter into this Agreement and to consummate the transactions contemplated hereby, Purchaser hereby represents and warrants to Seller and agrees as follows:

**6.1**    **Organization and Authority of Purchaser.**

(a)    Purchaser is a California charitable trust duly organized, validly existing and in good standing under the laws of the State of California. Purchaser has full power and authority to execute, deliver and perform its obligations under this Agreement and all of the Ancillary Documents to which it is (or will be) a party. The execution, delivery and performance of this Agreement and such Ancillary Documents by Purchaser have been duly authorized and approved by Purchaser's governing board and do not require any further authorization. This Agreement has been duly authorized, executed and delivered by Purchaser and is the legal, valid and binding agreement of Purchaser enforceable against Purchaser in accordance with its terms, and each Ancillary Document to which Purchaser is (or will be) a party has been duly authorized by Purchaser and upon execution and delivery by Purchaser will be a legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its terms, except as (i) enforceability may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting creditors' rights generally and (ii) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses.

(b)    None of the execution and delivery of this Agreement or any of the Ancillary Documents by Purchaser, the consummation by Purchaser of any of the transactions contemplated hereby or thereby, or compliance with or fulfillment of the terms, conditions and provisions hereof or thereof by Purchaser, will (A) conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default or an event of default, or permit the acceleration of any Liability or obligation or loss of a material benefit, or result in the creation of any Liabilities and Encumbrance on any of the assets or properties of Purchaser (in each case with or without notice or lapse of time or both), under (i) any charter (or similar governing instrument) or bylaws (or similar governing document) of Purchaser, (ii) any Order to which Purchaser or any of its assets is bound or subject, (iii) any Legal Requirement affecting Purchaser, or (iv) any Contract to which Purchaser is a party or otherwise bound, or (B) require

the approval, consent, authorization or act of, or the making by Purchaser of any declaration, filing or registration with, any Person, other than filings with the Bankruptcy Court.

**6.2     Payment of Purchase Price; Bidding Procedures.**

The obligations of Purchaser under this Agreement are not contingent on the availability of financing or any further due diligence. Purchaser has and shall have at the Closing sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make payment of the Cash Balance to Seller pursuant to this Agreement and to pay any other amounts to be paid by it hereunder, including the Assumed Liabilities.  Purchaser has read the Bidding Procedures Order and the Bidding Procedures and agrees to comply with all of the provisions therein.

**6.3     Investigation by Purchaser**.

Purchaser acknowledges and affirms that it has completed its own independent investigation, analysis and evaluation of the Purchased Assets, that it has made all such reviews and inspections of the Purchased Assets as it deems necessary and appropriate, and that in making its decision to enter into this Agreement and consummate the transactions contemplated by this Agreement and the Ancillary Agreements, it has relied on its own investigation, analysis, and evaluation with respect to all matters without reliance upon any express or implied representations or warranties except as expressly set forth in this Agreement.

**6.4     Ownership of Debtor; Good Faith.**

Purchaser does not hold, directly or indirectly, any beneficial or other ownership interest in Debtor or any of its securities or in any Affiliate of the Debtor.  Purchaser has not colluded with any other bidder for the purchase of the Purchased Assets (other than any arrangement disclosed to Seller, including Purchaser's acquisition of the Purchased Assets on behalf of itself together with one or more charitable trusts or private foundations) nor engaged in any action that undermines or would tend to undermine the contemplated Auction or the integrity of the Seller's effort to market or sell the Purchased Assets.  Seller acknowledges that The J. Paul Getty Trust is entering into this Agreement as "Purchaser" as the representative of and on behalf of The J. Paul Getty Trust, The Ford Foundation, John D. and Catherine T. MacArthur Foundation and The Andrew W. Mellon Foundation.  Seller acknowledges and agrees that Purchaser may take title to the Purchased Assets on behalf of such parties and at Purchaser's request, Seller shall convey title to the Purchased Assets pursuant to the applicable Ancillary Documents to The J. Paul Getty Trust as the representative of such parties, to such parties as tenants-in-common or in such other manner as Purchaser may reasonably request, provided that the foregoing shall not reduce or limit Purchaser's liabilities or obligations under this Agreement in any manner whatsoever.

**SECTION 7**
**COVENANTS OF THE PARTIES**

The Parties covenant and agree to take the following actions between the date hereof and the earlier of the termination of this Agreement and the Closing Date:

**7.1**     **Maintenance of Purchased Assets Prior to the Closing Date.**

From and after the date hereof until the earlier of the Closing Date and the termination of this Agreement in accordance with the terms of Section 9 hereof, Seller shall preserve the Purchased Assets and maintain the Purchased Assets in the same condition as heretofore maintained and maintain the insurance policies with respect thereto as in effect as of the date hereof.

**7.2**     **Access to the Business by Purchaser.**

Seller shall permit Purchaser's authorized Representatives reasonable access during regular business hours and upon reasonable notice, to the offices, properties, agreements and other documentation and financial records with respect to the Purchased Assets and the Assumed Liabilities all to the extent Purchaser reasonably requests and subject to the terms of any third party agreements governing the storage facilities utilized by Seller.

**7.3**     **Expenses.**

Except to the extent otherwise specifically provided herein, whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the Party incurring such costs and expenses.

**7.4**     **Governmental Approvals.**

(a)     Seller and Purchaser shall act diligently and reasonably, and shall reasonably cooperate with each other, to do or cause to be done, all things necessary, proper or advisable consistent with applicable confidentiality and Legal Requirements to cause the conditions precedent to the Closing to be satisfied and to cause the Closing to occur, including to secure any consents and approvals of any Governmental Authority required to be obtained by them (solely to the extent applicable law permits such approvals to be obtained), in order to permit the consummation of the transactions contemplated by this Agreement, or to otherwise satisfy the conditions set forth in Section 8, in each case as necessary to the extent such consents are not provided for or satisfied by the Sale Order and are permitted by applicable law. Notwithstanding any other provision of this Agreement to the contrary, nothing herein shall be construed to require Seller to cooperate with Purchaser in obtaining any consent or approval, or undertaking any action in furtherance or consummation of the transactions herein or contemplated hereby, that Seller determines in her sole discretion would violate any applicable law.

(b)     Subject to all applicable confidentiality and Legal Requirements, prior to the Closing, each of Seller and Purchaser (i) shall promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other Party to review in advance any proposed written communication or information submitted to any such Governmental Authority in response thereto; provided, that a Party may request entry into a joint defense agreement as a condition to providing any such materials and that, upon

receipt of that request, the Parties shall work in good faith to enter into a joint defense agreement to create and preserve attorney-client privilege in a form and substance mutually acceptable to the Parties. In addition, prior to the Closing, none of the Parties shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless such Party consults with the other Parties in advance and, to the extent permitted by any such Governmental Authority, gives the other Parties the opportunity to attend and participate thereat, in each case to the maximum extent practicable. Subject to any restrictions under applicable laws, rules or regulations, prior to the Closing, each Party shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine) or any such filing, notification or request for approval. Each Party shall also furnish the other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval, to the extent such assistance would not violate any otherwise applicable law. Seller and Purchaser shall prosecute all required requests for approval with all necessary diligence and otherwise use their respective commercially reasonable efforts to obtain the grant thereof by an Order as soon as possible including in order to resolve such objections or suits which, in any case if not resolved, could reasonably be expected to prevent, materially impede or materially delay the consummation of the transactions contemplated hereunder or the other transactions contemplated hereby, including by Purchaser selling, holding separate or otherwise disposing of or conducting its business in a manner which would resolve such objections or suits or agreeing to sell, hold separate or otherwise dispose of or conduct its business in a manner which would resolve such objections or suits or permitting the sale, holding separate or other disposition of, any of its assets or the assets of its subsidiaries or the conducting of its business in a manner which would resolve such objections or suits.

(c)     In the event that any Action or Proceeding is instituted (or threatened to be instituted) by a Governmental Authority or private party challenging the transactions hereunder or any other agreement contemplated hereby, (i) each Party shall reasonably cooperate with each other and use its respective commercially reasonable efforts to contest and resist any such Action or Proceeding and to have vacated, lifted, reversed or overturned any decree, judgment, injunction or other order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents or restricts consummation of the transactions contemplated by this Agreement; (ii) Seller and Purchaser shall defend, and bear their respective cost and expense, with respect to any action or actions, whether judicial or administrative, in connection with the transactions contemplated by this Agreement; and (iii) except as otherwise expressly set forth herein, any such Action or Proceeding shall not release, modify or extinguish Purchaser's obligation to purchase the Purchased Assets pursuant to the terms hereof; provided however that any duty of Seller to cooperate and provide assistance to Purchaser hereunder, including with respect to any Action or Proceeding, shall not require Seller to incur time, costs and expenses that the Seller determines in her sole discretion and judgment would (i) jeopardize the

administration or solvency of the Bankruptcy Case or the Estate or  (ii) otherwise violate any applicable law.

**7.5** **Tax Matters.**

(a) Seller  shall be liable for and shall pay, and pursuant to <u>Section 7.5(c)</u> shall reimburse Purchaser for, all Taxes (whether assessed or unassessed) applicable to the Purchased Assets, in each case attributable to periods (or portions thereof) ending on or prior to the Closing Date. Without limiting the obligations of Purchaser contained elsewhere in this Agreement, including in respect of the Assumed Liabilities, Purchaser shall be liable for and shall pay, and pursuant to <u>Section 7.5(c)</u> shall reimburse Seller for, all Taxes (whether assessed or unassessed) applicable to the Purchased Assets and the Assumed Liabilities, in each case attributable to periods (or portions thereof) beginning after the Closing Date. For purposes of this paragraph (a), any period beginning before and ending after the Closing Date shall be treated as two partial periods, one ending on the Closing Date and the other beginning on the day after the Closing Date except that Taxes (such as property Taxes) imposed on a periodic basis shall be allocated on a daily basis.

(b) Without limiting the other terms set forth in this Agreement, any sales Tax, use Tax, real property transfer or gains Tax, real property records recordation fees, documentary stamp Tax or similar Tax attributable to the sale or transfer of the Purchased Assets and not exempted under the Sale Order or by section 1146(c) of the Bankruptcy Code or other applicable law shall be borne by Seller.

(c) Seller or Purchaser, as the case may be, shall provide reimbursement for any Tax paid by one Party all or a portion of which is the responsibility of the other Party in accordance with the terms of this <u>Section 7.5</u>. Within a reasonable time prior to the payment of any such Tax, the Party paying such Tax shall give notice to the other of the Tax payable and each Party's respective liability therefor, although failure to do so will not relieve the other Party from its liability hereunder.

(d) Purchaser and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Debtor's business and the Purchased Assets (including access to Books) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, Action or Proceeding relating to any Tax. Purchaser and Seller shall retain all Books with respect to Taxes pertaining to the Purchased Assets for a period of the lesser of least three years following the Closing Date and the closing of the Bankruptcy Case. On or after the end of such period, each Party shall provide the other with at least ten (10) days prior written notice before destroying any such Books, during which period the Party receiving such notice can elect to take possession, at its own expense, of such Books. Seller and Purchaser shall cooperate with each other in the conduct of any audit or other Proceeding relating to Taxes involving the Purchased Assets.

(e) Notwithstanding any other provision hereof to the contrary, the tax payment obligations of Seller under this Section 7, and any and all other obligations of Seller

hereunder that do or may involve the payment of money or transfer of property, shall under no circumstances ever be construed as personal obligations of the Seller but solely as obligations in her capacity as the trustee of the Estate, and all such obligations shall be enforceable solely against the Estate to the extent of available funds therein and in accordance with the priority provisions of the Bankruptcy Code and never against the Seller personally (except that any return of the Deposit shall be an obligation of Seller solely as trustee of the Estate, if the conditions for such return are satisfied as set forth in Section 9 hereof).

### 7.6    **Bankruptcy Matters.**

(a)    This Agreement, the parties' obligations hereunder and the transactions contemplated hereby are subject to approval of the Bankruptcy Court.  Until the conclusion of the Auction, Seller is permitted to, and may cause its Representatives and Affiliates to, initiate contact with, provide information to, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates, agents and Representatives) in connection with any sale or other disposition of the Purchased Assets, subject to the provisions of the Bidding Procedures Order.  From and after the date on which the Bidding Procedures Order is entered until the conclusion of the Auction, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Purchased Assets, and perform any and all other acts related thereto which are required or permitted under the Bankruptcy Code or other applicable law, including, without limitation, supplying information relating to the Purchased Assets to prospective purchasers, subject to the provisions of the Bidding Procedures Order.

(b)    Seller shall use commercially reasonable efforts to ensure that the Sale Order is entered no later than July 25, 2019, that the Sale Order becomes effective immediately upon entry and that the provisions of Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d) is waived for cause.  Purchaser agrees to consummate the Closing at any time on or after entry of the Sale Order without awaiting the expiration of any appeal period otherwise applicable thereto.

(c)    The Seller will request of the Court that the Sale Order provide, among other things mutually acceptable to Seller and Purchaser, that pursuant to Sections 105, 363 and 365 of the Bankruptcy Code: (i) the Seller's, Debtor's and the Estate's interests in the Purchased Assets shall be sold to Purchaser free and clear of all pledges, options, charges, Liabilities, liens, claims (as defined in section 101(5) of the Bankruptcy Code), Encumbrances, or interests, including any rights or claims based on any successor, transferee and environmental claims; (ii) the transactions contemplated by this Agreement were negotiated at arm's length, that Purchaser acted in good faith in all respects and Purchaser shall be found to be a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code; (iii) the terms and conditions of the sale of the Purchased Assets to Purchaser as set forth herein are approved; (iv) Seller and Purchaser are each authorized and directed to consummate the transactions contemplated by this Agreement and to comply in all respects and with the terms of this Agreement; (v) Purchaser and Seller did not engage in any conduct that would allow the transactions contemplated by this Agreement to be set aside pursuant to Section 363(m) of the Bankruptcy Code;  and (vi) the Sale Order is binding upon any successors to Seller.

**7.7**    **Adequate Assurances Regarding Assumed Contracts and Assumed Leases.**

With respect to each Assumed Contract and each Assumed Lease, Purchaser will provide adequate assurance as required under the Bankruptcy Code of the future performance by Purchaser of each such Assumed Contract and Assumed Lease. Purchaser and Seller agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Contracts and the Assumed Leases, such as furnishing affidavits, non-confidential financial information or other documents or information for filing with the Bankruptcy Court and making Purchaser's and Seller's respective employees and Representatives available to testify before the Bankruptcy Court.

**7.8**    **Intentionally Omitted.**

**7.9**    **Reasonable Access to Records and Certain Personnel.**

In order to facilitate Seller's efforts to (i) administer and close the Bankruptcy Case, and (ii) prepare tax returns (together, the "Post-Close Filings"), for a period of six (6) months following the Closing, Purchaser shall permit Seller and Seller's counsel and accountants (collectively, "Permitted Access Parties") during regular business hours, with reasonable notice, and subject to reasonable rules and regulations, reasonable access to the financial and other books and records which comprised part of the Purchased Assets that are required to complete the Post-Close Filings, which access shall include (x) the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such required documents and records and (y) Purchaser's copying and delivering to the relevant Permitted Access Parties such documents or records as they require, but only to the extent such Permitted Access Parties furnish Purchaser with reasonably detailed written descriptions of the materials to be so copied; provided, however, that the foregoing rights of access shall not be exercisable in such a manner as to interfere with the normal operations of Purchaser's business.

**7.10**    **Collection of Receivables.**

If, after the Closing Date, Seller shall receive payment from any account debtor with respect to any Accounts Receivable included in the Purchased Assets, Seller shall promptly thereafter deliver such funds and assets to Purchaser and take all steps necessary to vest title to such funds and/or assets in Purchaser.

**7.11**    **Obligations of Seller**.

Notwithstanding anything in this Agreement to the contrary, the obligations of Seller pursuant to this Article 7 shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case), and Seller's obligations as a bankruptcy trustee to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order).

**7.12**   **Notification of Breach; Disclosure.**

Each Party shall promptly notify the other of any event, condition or circumstance of which such Party becomes aware prior to the Closing Date that would cause, or would reasonably be expected to cause, a violation or breach of this Agreement (or a breach of any representation or warranty contained in this Agreement). During the period prior to the Closing Date, each Party will promptly advise the other in writing of any written notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement. It is acknowledged and understood that no notice given pursuant to this <u>Section 7.12</u> shall have any effect on the representations, warranties, covenants or agreements contained in this Agreement for purposes of determining satisfaction of the conditions contained herein.

**SECTION 8**
**CONDITIONS TO CLOSING**

**8.1**   **Conditions to Obligations of Each Party.**

The respective obligations of each Party to effect the sale and purchase of the Purchased Assets and to consummate the other transactions contemplated by this Agreement shall be subject to the fulfillment (or, if permitted by applicable law, waiver) on or prior to the Closing Date, of the following conditions:

(a)   all requisite authorizations or consents from Governmental Authorities or waiting periods following governmental filings shall have been obtained or expired, as the case may be;

(b)   the Sale Order shall have (i) been entered and become immediately effective for purposes of Bankruptcy Rules 6004(h) and 6006(d), (ii) found that Purchaser is a "good faith purchaser" for purposes of Section 363(m) of the Bankruptcy Code and (iii) not been stayed, so that the Closing may be effective and valid under Section 363(m) of the Bankruptcy Code; and

(c)   no Governmental Authority shall have enacted, issued, promulgated or entered any Order that is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement that has not been withdrawn or terminated.

**8.2**   **Conditions to Obligations of Purchaser.**

(a)   The obligation of Purchaser to purchase the Purchased Assets and to consummate the other transactions contemplated by this Agreement shall be subject to the fulfillment on or prior to the Closing Date of the following additional conditions:

(i)   the representations and warranties of Seller contained in this Agreement, the Ancillary Documents and all other documents, instruments and certificates required to be delivered to Purchaser at or in connection with the Closing shall be true and correct in all respects when made and on and as of the Closing Date with the same effect as if

-29-

such representations and warranties had been made on and as of such date (except to the extent such representations and warranties speak as of an earlier date, in which case, such representations and warranties shall be true and correct in all respects as of such earlier date), interpreted without giving effect to any Material Adverse Effect or materiality qualifications, except where all failures of such representations and warranties to be true and correct, in the aggregate, do not have or would not reasonably be expected to have, a Material Adverse Effect, and Purchaser shall have received a certificate of Seller to such effect signed by a duly authorized Representative thereof;

(ii)     each covenant and obligation that Seller is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects, and Purchaser shall have received a certificate of Seller to such effect signed by Seller or a duly authorized Representative thereof; and

(iii)     each of the deliveries required to be made to Purchaser pursuant to Section 4.3 shall have been so delivered;

(b)     Any condition specified in Section 8.2(a) may be waived by Purchaser; provided that no such waiver shall be effective against Purchaser unless it is set forth in a writing executed by Purchaser.

### 8.3     Conditions to Obligations of Seller.

(a)     The obligation of Seller to sell the Purchased Assets and to consummate the other transactions contemplated by this Agreement shall be subject to the fulfillment on or prior to the Closing Date of the following additional conditions:

(i)     the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects when made and on and as of the Closing Date with the same effect as if such representations and warranties had been made on and as of such date (except that any representations and warranties that are made as of a particular date or period shall be true and correct only as of such particular date or period), and Seller shall have received a certificate of Purchaser to such effect signed by a duly authorized Representative thereof;

(ii)     each covenant and obligation that Purchaser is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects, and Seller shall have received a certificate of Purchaser to such effect signed by a duly authorized person thereof;

(iii)     each of the deliveries required to be made to Seller pursuant to Section 4.2 shall have been so delivered; and

(b)     Any condition specified in Section 8.3(a) may be waived by Seller; provided that no such waiver shall be effective against Seller unless it is set forth in writing executed by Seller.

## SECTION 9
## TERMINATION

**9.1**     **Termination.**

This Agreement may be terminated, and the transactions contemplated hereby may be abandoned, by written notice to the other Parties hereto, at any time prior to the Closing Date, as follows:

(a)     by mutual written consent of Purchaser and Seller;

(b)     by either Purchaser or Seller if any permanent injunction or other Order of a Governmental Authority which prevents the consummation of the transactions contemplated by this Agreement shall have become final and not appealable;

(c)     by either Purchaser or Seller upon three (3) days written notice of such termination to the other Party, if the Closing shall not have occurred on or prior to July 26, 2019; provided, however, that the failure of the Closing to occur on or before such date is not due (in whole or in part) to a material breach by the terminating Party of such Party's representations, warranties, covenants or obligations under this Agreement;

(d)     by Seller if there has been a breach by Purchaser of any of its representations, warranties, covenants or obligations that would result in a condition set forth in Section 8.3(a)(i), (a)(ii), or (a)(iii) not being met, which breach is not curable, or if curable, is not cured within thirty (30) days after notice of such breach is given by Seller to Purchaser, and has not been waived by Seller;

(e)     by Purchaser if there has been a breach by Seller of any of her representations, warranties, covenants or obligations that would result in the condition set forth in Section 8.2(a)(i), (a)(ii) or (a)(iii) not being met, which breach is not curable, or if curable, is not cured within thirty (30) days after notice of such breach is given by Purchaser to Seller, and has not been waived by Purchaser;

(f)     by either Purchaser or Seller if an Alternative Transaction is consummated;

(g)     by Purchaser if the Bankruptcy Court fails to enter the Sale Order by 11:59 PM CST on July 26, 2019;

(h)     by Purchaser if the Sale Order is entered but stayed by court order and any court order entered staying the Sale Order has not been lifted by July 26, 2019 or by such other closing date agreed to by the Parties; or

(i)     by Purchaser if any Material Adverse Effect occurs.

**9.2** **Effect of Termination.**

(a)     If this Agreement is terminated by Seller pursuant to Section 9.1(d), Seller shall be entitled to (i) retain the Deposit as liquidated damages as its sole remedy or (ii) seek specific performance of this Agreement in the Bankruptcy Court to the extent Purchaser is capable of effecting the Closing, whereupon Purchaser shall proceed to consummate the Closing forthwith in accordance with the terms hereof and any applicable orders of the Bankruptcy Court.

(b)     If this Agreement is terminated by Purchaser pursuant to Section 9.1(e), Purchaser shall be entitled to (i) the return to Purchaser of the Deposit within three (3) Business Days after Purchaser's demand therefor or (ii) Purchaser may elect to seek specific performance of this Agreement in the Bankruptcy Court to the extent Seller is capable of effecting the Closing, whereupon Seller shall proceed to consummate the Closing forthwith in accordance with the terms hereof and any applicable orders of the Bankruptcy Court.

(c)     If this Agreement is terminated for any reason provided hereunder other than as specified in Section 9.2(a) or Section 9.2(b), Seller shall return to Purchaser the Deposit within three (3) Business Days of such termination.

In the event of termination of this Agreement by either Party, all rights and obligations of the Parties under this Agreement shall terminate without any liability of any Party to any other Party except as otherwise provided in this Section 9 and except that each Party shall be liable for any willful and intentional breach of this Agreement by such Party. Notwithstanding the foregoing, the provisions of Section 9.2 and Section 10, shall expressly survive the expiration or termination of this Agreement.

### SECTION 10
### MISCELLANEOUS PROVISIONS

**10.1** **Amendment and Modification.**

This Agreement may be amended, modified or supplemented only by a written instrument signed on behalf of Seller and Purchaser making specific reference to this Agreement.

**10.2** **Survival.**

None of the representations and warranties of the Parties in this Agreement, in any instrument delivered pursuant to this Agreement, or in the Schedules or Exhibits attached hereto shall survive the Closing, and no Party hereto shall, or shall be entitled to, make any claim or initiate any action against any other Party with respect to any such representation or warranty from or after the Closing. All covenants and agreements contained herein which by their terms contemplate actions or impose obligations following the Closing shall survive the Closing Date and remain in full force and effect in accordance with their respective terms.

**10.3** **Notices.**

All notices or other communications required or permitted hereunder shall be in writing and shall be given or delivered by personal delivery, by facsimile or e-mail, or by a nationally recognized private overnight courier service addressed as follows:

If to Purchaser, to:

> The J. Paul Getty Trust
> Attention:
> Stephen Clark
> 1200 Getty Center Drive
> Los Angeles, California 90049
> E-mail:  SWClark@getty.edu

with a copy to (which alone shall not constitute notice):

> Munger, Tolles & Olson LLP
> Attention:  George Fatheree
> 350 South Grand Avenue, 50th Floor
> Los Angeles, California 90071
> E-mail:  george.fatheree@mto.com

If to Seller, to:

> Chuhak & Tecson PC
> Attention: Miriam R. Stein, Esq., in her capacity as Chapter 7
> Trustee of the Estate of Johnson Publishing Company, LLC
> 30 South Wacker Drive, Suite 2600
> Chicago, Illinois 60606
> E-mail: mstein@chuhak.com

with a copy to (which alone shall not constitute notice):

> Fox Swibel Levin & Carroll LLP
> Attention: N. Neville Reid, Esq.
> 200 W. Madison Street, Suite 3000
> Chicago, Illinois 60606
> E-mail: nreid@foxswibel.com

or to such other address or e-mail address as such Party may indicate by a notice delivered to the other Parties hereto.

Any notice, consent, authorization, direction or other communication delivered as aforesaid shall be deemed to have been effectively delivered and received, if sent by a nationally recognized private overnight courier service, on the date following the date upon which it is delivered for overnight delivery to such courier service, if delivered personally (with written confirmation of receipt), on the date of such delivery or, if sent via facsimile or e-mail, on the date of the transmission of the facsimile or e-mail.

**10.4    Successors and Assigns.**

Except as expressly permitted in this Agreement, the rights and obligations of the Parties under this Agreement shall not be assignable by such Parties without the written consent of the other Parties hereto and any such assignment shall be null and void; provided, however, that the rights of Purchaser under this Agreement may be assigned by Purchaser, without the prior written consent of Seller, to any Affiliate thereof under common control with Purchaser; provided, however, that Purchaser shall remain liable hereunder until and unless released by Seller. Subject to the foregoing, this Agreement and all of the provisions hereof shall be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and permitted assigns.

**10.5    Severability.**

If any non-material term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon a determination that any term or other provision of this Agreement is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible; provided, however, that in doing so, no Party shall be obligated to waive or forego any material right or benefit available to it hereunder.

**10.6    Governing Law.**

(a)    This Agreement shall be governed by, and construed in accordance with, the relevant laws of the United States, including federal copyright, trademark and patent laws, and with the laws of the State of Illinois applicable to contracts executed in and to be performed in that State, without regard to choice or conflict of law principles that would result in application of any laws other than the laws of the State of Illinois.

(b)    All Actions and Proceedings arising out of or relating to this Agreement, including the resolution of any and all disputes hereunder, shall be heard and determined in the Bankruptcy Court, and the Parties hereby irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court in any such Action or Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding. The Parties hereby

consent to service of process by mail (in accordance with <u>Section 10.3</u>) or any other manner permitted by law.

(c)     THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SELLER, PURCHASER, OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

### 10.7   <u>Waivers.</u>

Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the Party or Parties entitled to the benefit thereof. Any such waiver shall be validly and sufficiently authorized for the purposes of this Agreement if, as to any Party, it is authorized in writing by an authorized Representative of such Party. Except as otherwise provided herein, the failure of any Party to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any Party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

### 10.8   <u>Execution in Counterparts.</u>

This Agreement may be executed in counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement, and shall become binding when one or more counterparts have been signed by and delivered to each of the Parties hereto. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or e-mail shall be effective as delivery of a manually executed counterpart of this Agreement.

### 10.9   <u>Incorporation of Schedules and Exhibits.</u>

All Schedules and all Exhibits attached hereto and referred to herein are hereby incorporated herein by reference and made a part of this Agreement for all purposes as if fully set forth herein.

### 10.10   <u>Entire Agreement.</u>

This Agreement (including all Schedules and all Exhibits) constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings among the Parties with respect thereto.

**10.11    Remedies.**

The Parties agree that irreparable damage may occur in the event that any provision of this Agreement were not performed in accordance with its specific terms or was otherwise breached and that monetary damages may not be an adequate remedy for any breach or threatened breach of any of the provisions of this Agreement. It is accordingly agreed that the Parties shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, and any such injunction shall be in addition to any other remedy to which any Party is entitled, at law or in equity.

**10.12    Mutual Drafting: Headings.**

The Parties participated jointly in the negotiation and drafting of this Agreement and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent. If an ambiguity or question of intent or interpretation arises, then this Agreement will accordingly be construed as drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. The descriptive headings and table of contents contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

**10.13    No Third Party Beneficiaries.**

This Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

**10.14    Bulk Sales Law.**

Purchaser hereby waives compliance by Seller with the requirements and provisions of any "bulk-transfer" laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Purchaser.

**IN WITNESS WHEREOF,** the parities hereto have caused this Asset Purchase Agreement to be executed the day and year first above written.

**PURCHASER:**

THE J. PAUL GETTY TRUST, a California charitable trust

By:_____

Name: _____

Title: _____

**SELLER:**

MIRIAM R. STEIN, NOT INDIVIDUALY, BUT SOLELY IN HER CAPACITY AS CHAPTER 7 TRUSTEE OF THE ESTATE OF JOHNSON PUBLISHING COMPANY, LLC

By:_____

Name:  Miriam R. Stein

Title:  Chapter 7 Trustee of the Bankruptcy Estate of Johnson Publishing Company, LLC

**IN WITNESS WHEREOF,** the parities hereto have caused this Asset Purchase Agreement to be executed the day and year first above written.

**PURCHASER:**

THE J. PAUL GETTY TRUST, a California
charitable trust

By: _____
Name:  Stephen W. Clark
Title:  VP. General Counsel & Secretary

**SELLER:**

MIRIAM R. STEIN, NOT INDIVIDUALY, BUT
SOLELY IN HER CAPACITY AS CHAPTER 7
TRUSTEE OF THE ESTATE OF JOHNSON
PUBLISHING COMPANY, LLC

By:_____
Name:  Miriam R. Stein
Title:  Chapter 7 Trustee of the Bankruptcy Estate
of Johnson Publishing Company, LLC